# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MARK A. CARDER,

        Plaintiff,

                         v.//CIVIL ACTION NO. 1:04CV109
                                     (Judge Keeley)

PRUDENTIAL INSURANCE COMPANY
OF AMERICA,

        Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter, pending before the Court on cross motions for summary judgment, raises the question of whether the plaintiff, Mark A. Carder ("Carder"), is entitled to disability benefits under an insurance policy issued by the defendant, Prudential Insurance Company of America ("Prudential"). For the reasons that follow, the Court **GRANTS** the defendant's motion for summary judgment (dckt no. 30) and **DISMISSES** the plaintiff's case.

### I.  FACTUAL BACKGROUND

Carder worked as a well tender for Dominion Appalachian Development Inc. ("Dominion") in Clarksburg, West Virginia for four years. He participated in Dominion's Group Insurance Contract with Prudential, which included contributory Long Term Disability Coverage ("LTD Plan"). This LTD Plan consists of a booklet that

describes the program of LTD benefits and a Certificate of Coverage, which together form the employee's Group Insurance Certificate. The record indicates that Carder is 54 years old.

Carder's medical records evidence a history of problems related to his esophagus, the tube that carries food from the mouth to the stomach, for which he has received treatment from a number of health care providers, including his primary physician, Louis Ortenzio (Dr. Ortenzio); gastroenterologists, Teodoro G. Medina and Edgar Achkar ("Dr. Achkar"); a thoracic surgeon, Thomas Rice ("Dr. Rice"); and a licensed professional counselor, Karen P. Noffsinger ("Noffsinger"). Medications such as Reglen, Zoloft, Topamax, Doxepin, Desyrel, Celexa, Serax, Lotesin, Neurontin and Prevacid have been prescribed to control these conditions.

## A.   <u>Carder's Medical History</u>

Carder's esophageal trouble started in 1990 when he suffered from progressively worsening dysphagia, the inability to swallow due to the narrowing of the esophagus, <u>Taber's Cyclopedic Medical Dictionary</u>, "dysphagia" (F.A. Davis, Inc. 2002), whenever he consumed fruit.

In 1997, Carder's condition had not improved and he received a diagnosis of achalasia. Achalasia is a disorder that renders the esophagus less able to move food toward the stomach because the

2

valve from the esophagus to the stomach does not relax as much as it needs to during swallowing. Taber's Cyclopedic Medical Dictionary, "achalasia" (F.A. Davis, Inc. 2002). Patients who suffer from this disorder usually complain of intermittent regurgitation and food "sticking" after swallowing. Minimal Access Surgery Center, New York Presbyterian Hospital, Thoracic Surgery at http://www.nyp.org/masc/myotomy.htm (last visited Aug. 25, 2005).

In 1998, Dr. Rice performed a laparoscopic myotomy, a surgery in which small incisions are made and a camera attached to a telescope is used to view the abdomen. Tubes are then passed through the incisions and "the abnormally thickened muscle surrounding the esophagus is incised to allow for improved swallowing. After completion of this [surgery] a gastric fundoplication or loose stomach wrap is created around the esophagus to minimize reflux." New York-Presbyterian Hospital, Minimal Access Surgery Center, Thoracic Surgery at http://www.nyp.org/masc/myotomy.htm (last visited Aug. 22, 2005).

This procedure enabled Carder to swallow food for approximately one year. Subsequently, his condition deteriorated to the point where he could not swallow almost any type of food, particularly fruit.

Consequently, Dr. Rice performed an esophagogastroduodenoscopy ("EGD"), an examination of the lining of the esophagus, stomach, and upper duodenum through the insertion of a small camera down the throat, and determined that Carder suffered from end-stage achalasia and dysphagia. MedLine Plus, Encyclopedia, "esophagogastroduodenoscopy" at http://www.nlm.nih.gov/medlineplus/ency/article/003888.html (last updated Aug. 18, 2005).

As a result, on March 21, 2000, Carder underwent a transhiatal esophagectomy with feeding jejunostomy, during which Dr. Rice replaced his esophagus with part of his intestine.

This surgery rendered him unable to work and, on May 1, 2000, Carder submitted a claim to secure LTD benefits under the Plan.

**B.    Carder's Application for LTD Benefits**

To qualify for LTD benefits, the Plan requires an employee to meet its definition of the term "totally disabled." An employee is "totally disabled" for the purposes of the Dominion LTD policy when:

> (1) Due to sickness or accidental injury, both of these are true:
>     (a) you are not able to perform, for wage or profit, the material and substantial duties of your occupation
>     (b) After the Initial Duration of a period of Total Disability, You are not able to perform, for wage or profit, the material and substantial duties of any job for which you are reasonably fitted by your

4

education, training, or experience. The initial duration is equal to the first 24 months of Inbenefit. (2) You are not working at any job for wage of profit. (3) You are under the regular care of a Doctor.

On Carder's LTD application, Dr. Rice diagnosed him with achalasia, a lifetime condition, and indicated that he had been confined in a hospital from March 21, 2000 until March 28, 2000. He listed his prognosis as "post-op recovery" and indicated that Carder could not lift more than twenty pounds.

In the "employee statement" section of the application, Carder stated that he would not be sure if he could return to work "until recovery from surgery on 3/21/00."

On September 7, 2000, Prudential approved Carder for LTD benefits, determining that he had met the requirements. It further concluded that Carder would not likely return to a physical job, but noted that Prudential's Triage Department ("Triage") had suggested early vocational intervention. Triage also indicated that Carder:

> . . . said he has Barrett's esophagus which is a pre-cancerous condition. He has Achalasia. Food wouldn't go down his esophagus and kept coming back up, reflux, vomit. Had to sleep in a chair the last ten years. Has lost 35 lbs. They recently removed his esophagus and used intestines to make new esophagus. Still has difficulty eating, has to eat soft foods, small amounts several times a day, gravity feeding. Still has to sleep in recliner. Doesn't get much sleep. Is very exhausted. Can't handle

> any meat. I asked if he tried strained meat and
> he said he hadn't. After surgery he was on a
> feeding tube for two months, could not even have
> water. He said the reflux has been worse after
> surgery. Meds. Regulan, Wellbutrin, Prevacid,
> Zoloft, Ambien. Doctor says he won't be able to
> do physical work again. Well tender of oil and
> gas wells was physical. Applied social security
> in May.[1]

Meanwhile, on July 10, 2000 and August 28, 2000, Dr. Rice performed follow-up EGDs which confirmed that Carder continued to suffer from dysphagia secondary to spasm.

## C.   Carder's Social Security Benefits

Upon approval, the Plan also required Carder to reapply for Social Security Disability Insurance ("SSDI") from the Social Security Administration ("SSA"). If a policyholder fails to apply to the SSA, Prudential automatically reduces his benefits by the amount of SSDI it believes he would have received.

On December 20, 2000, Prudential sent Carder a letter outlining this policy and offering to "make available to [him, at Prudential's expense], the services of Disability Benefits Corporation [("DBC")], a Social Security Assistance agency who will assist you in a renewed effort to obtain Social Security benefits." Carder agreed and, subsequently, DBC completed the SSDI application

---

[1]The record indicates that Carder had been rejected for Supplemental Security Income from the SSA on May 17, 2000 because he and his wife had resources amounting to greater than $3,000.

6

on his behalf, listing his diagnoses as Barrett's esophagus[2] and achalasia. DBC further summarized Carder's post-surgical history and indicated that his condition prevents him from performing all types of work, is expected to last more than twelve months and that the possibility of rehabilitation and alternative work "have been thoroughly explored."

Based on this application, Carder received SSDI on January 8, 2001. Prudential adjusted its payment to him accordingly.

**D.    Carder's Medical Treatment Post-LTD Benefit Approval**

Subsequent to his March 2000 surgery, Carder had a series of follow-up appointments with Dr. Rice.

According to Dr. Rice, on November 6, 2000 Carder denied any problem eating or drinking; however, he did complain of pain and coughing in the evening and acid reflux.

Dr. Rice subsequently ordered an EGD with pylorus dilation and a CT scan of Carder's abdomen. Although the EGD revealed mild to moderate gastric retention and the CT scan revealed a large amount

---

[2] Barrett's esophagus is "a disorder in which the lining of the esophagus . . . is damaged because of stomach acid that leaks back into and irritates the esophagus. This leakage of acid is commonly known as 'heartburn.'" MedLine Plus, Encyclopedia, "Barrett's esophagus" at http://www.nlm.nih.gov/medlineplus/ency/article/001143.html (last updated Aug. 18, 2005).
According to the record, this may also be a pre-cancerous condition.

of food material residing within Carder's stomach, Dr. Rice classified these results as "unremarkable."

On December 15, 2000, Carder met with Dr. Rice again, this time complaining of chest pains; however, chest x-rays taken on December 15, 2000 and June 18, 2001 appeared normal. Dr. Rice concluded that Carder may have been experiencing symptoms of a hiatal hernia or obstructed distal esophagus.

Consequently, on June 18, 2001, Carder underwent an esophageal dilation ("dilation"), a procedure which stretches or opens a blocked portion of the esophagus. Although Dr. Rice has performed this procedure on Carder as needed, the record reflects that this is the only dilation Carder has received since his March 2000 surgery.

Meanwhile, according to Prudential's phone records, on February 15, 2001, Barbara Allu ("Allu"), a Prudential employee, spoke with Carder regarding his condition. Carder informed her that he did not feel ready to return to work and expressed concern regarding the availability of jobs in his area. According to Allu's notes, "he said there are so few jobs around here and I have always done physical work. . . . they closed all the coal mines. It is a very depressed area, people who used to earn $25 an hour are now working for $6.00 an hour at Wal-Mart." Allu suggested

**MEMORANDUM OPINION AND ORDER**

that Carder look into vocational schools and begin researching jobs that might interest him in order to prepare for the possibility of returning to work. Carder then agreed to fill out a vocational services form regarding his educational and job history for Prudential's records.

Subsequently, Carder met with Dr. Ortenzio. According to Dr. Ortenzio's office notes, on September 28, 2001, Carder complained of diarrhea and a fluctuating appetite. Dr. Ortenzio observed that Carder had experienced depression "again" and further noted that Carder's psychotherapist recommended the drug Celexa to treat his condition. Accordingly, Dr. Ortenzio prescribed Celexa, encouraged Carder to "up his activities" and ordered him to return in six weeks. He also diagnosed Carder with irritable bowel syndrome ("IBS") and peptic ulcer disease ("PUD"). On November 13, 2001, Carder met with Dr. Ortenzio again, at which time he reported gastrointestinal ("GI") trouble, difficulty swallowing and chest pain.

On November 15, 2001, however, Carder visited Dr. Rice, where he denied any dysphagia and reported that he ate small, frequent meals. In fact, Dr. Rice indicated that Carder only complained of acid reflux. Consequently, he ordered a chest x-ray, which appeared normal, and another EGD with dilation of pylorus and

anastomosis.   When the EGD revealed moderate delay in gastric emptying with no evidence of anastomotic stricture, PUD or esophagitis, Dr. Rice ordered Carder to take Reglan four times a day and to see him once a year for a routine check-up with an EGD.

Carder followed Dr. Rice's instructions and returned one year later.   Once again, his EGD and check-up revealed only delayed gastric emptying.

**E.   Prudential's Review of Carder's Claim**

Meanwhile, on March 4, 2002, Carder received a letter from Prudential indicating that his "Initial Duration period of Total Disability," i.e., twenty-four months, would expire on September 12, 2002.   Consequently, his claim needed to be thoroughly evaluated to determine his eligibility beyond that date under "the more restrictive definition of Total Disability" that applies to claims after the Initial Duration period.   Prudential also attached a Medical Authorization for Carder to sign and return.

On March 5, 2002, progress reports entered by Prudential's claim managers ("SOAP notes") indicate that a July 2001 scan of Carder's intestine revealed that Carder suffered from Chrone's disease.   According to Prudential, this prevents physical but not sedentary work.   Further, the SOAP notes indicate that Carder had

10

reported his ability to perform light housework, grocery shop, attend counseling, take care of two puppies and go fishing. Thus, Prudential decided to request his current medical records and investigate Carder's gainful employment options.

On May 22, 2002, Prudential's vocational services performed a hypothetical employability assessment for Carder. This assessment indicated four sedentary occupations in the Clarksburg, West Virginia area that required minimal on-the-job training. These occupations - Order Clerk, Customer Service Representative, Procurement Clerk and Dispatcher, Oil Well Services - carried hourly salaries of $11.78, $12.15, $12.94 and $13.01, respectively. Carder had previously made an hourly salary of $13.88. Triage also performed a clinical review of Dr. Ortenzio and Dr. Rice's medical records.

Subsequent to these reviews, Susan Garcia ("Garcia"), Carder's Claim Manager, concluded that his esophageal condition had stabilized. She noted that Carder had not been required to see his physicians since November 2001 and, further, that Carder's primary complaint appeared to be his mental or nervous condition. Unfortunately, his ability to receive benefits for these conditions had expired in September 2002.

Thus, because Carder had no significant functional impairment associated with his medical condition that would prevent him from working in a gainful sedentary occupation, Prudential terminated his benefits.

Garcia sent Carder a letter and left him a telephone message to inform him of Prudential's decision.

On June 19, 2002, after receiving Garcia's message, Carder's wife contacted her for an explanation.  According to Garcia's phone log, Garcia informed Mrs. Carder that Carder's benefits had been terminated in light of his stable condition and ability to perform alternative occupations.   In response, Mrs. Carder stated that Carder would need to be trained before he could return to another occupation and that he "is on a lot of meds for his depression and seeing a counselor."   She further indicated that Carder's depression is caused by the pain in his chest.  Garcia advised Mrs. Carder that she would receive a letter detailing the reasons for Prudential's decision and explaining the appeal process.

**F.    Carder's First Appeal**

After receiving notice of the termination of his benefits, Carder appealed Garcia's decision to Prudential's Appeals Review Unit ("Unit").  On July 30, 2002, he sent the Unit a letter stating that he is unable to work because he suffers from achalasia, still

has difficulty swallowing, has severe reflux, pain in the chest
"and numerous other problems which affects my eating, sleeping and
emotional problems." He further noted that he visits Dr. Rice to
get his esophagus stretched in small increments as necessary and
that his "depression and anxiety, both stem from [his] medical
conditions which did not occur until after [his] surgery."

The Unit also received letters from Dr. Ortenzio and
Nofflinger, Carder's professional counselor, on July 26, 2002 and
July 29, 2002, respectively. Dr. Ortenzio's letter indicated that
he had examined Carder on a monthly basis over the previous six
months. He detailed Carder's poor ability to eat, swallow and
guard against reflux and regurgitation despite aggressive
treatment, and noted that he was considering referring Carder back
to a GI specialist or to Dr. Rice for further ideas. He also
mentioned that Carder suffers from post-thoracotomy syndrome with
chest pain, which is a pain syndrome that may result if nerves are
damaged during thoracic surgery.

Nonetheless, Dr. Ortenzio conceded that Carder suffers from
anxiety and depression and that there is "some truth" to
Prudential's conclusion that Carder's esophageal condition has
stabilized. He insisted, however, that "these conditions are
stable at or below a level which would preclude" his returning to

<u>**MEMORANDUM OPINION AND ORDER**</u>

his job as a well tender "and for that matter any type of gainful employment. His status is 'less than sedentary.'" Further, with regard to Carder's depression, he stated that Carder "has remained 'tough' and has done better than most in dealing with his many losses."

Noffsinger's letter noted that Carder has significant problems with depression and sleep and that medication has been unsuccessful as a long-term treatment option. She had treated Carder since July 28, 2000, when he experienced a "major depressive episode and also problems relating to anxiety regarding his medical condition" and was currently meeting with him on a weekly basis due to "a recurrence of several of the major depressive symptoms."

According to Noffsinger, Carder was not "physically able to function in a job with the type of fatigue which he has been experiencing." She further discusses Carder's eating problems, irritable bowel syndrome ("IBS") and extreme dizziness. She attributed Carder's depression to these physical problems, stating that:

> Mr. Carder is severely depressed at this time
> due to the stress related to his worries
> regarding his physical limitations. He is also
> very concerned about the financial burdens on
> his family should he lose the LTD. . . . His
> self image is very enmeshed in his ability to
> work and provide for his family.
> [. . .]

14

## MEMORANDUM OPINION AND ORDER

> I am extremely concerned about Mr. Carder and
> his emotional state at this time.    In my
> professional [opinion], Mr. Carder's LTD should
> be extended.

Subsequently, the Unit requested post-2001 medical materials from Dr. Ortenzio.  The materials submitted consisted primarily of notes made by Dr. Ortenzio during Carder's office visits.  These notes establish that:

**1)**    On February 19, 2002, Carder continued to complain of difficulty swallowing and reported that he "knows he cannot work at any gainful employment in his present condition."  Dr. Ortenzio continued his treatment and recommended that Carder see him in six weeks;

2)    On April 4, 2002, Carder was in better spirits.  Dr. Ortenzio noted the absence of GI complaints, but commented that Carder still suffered from IBS and disrupted sleep.  He recommended that Carder follow up with a psychologist, encouraged him to continue psychotherapy and ordered him to return in one month;

**3)**    On May 14, 2002, Carder's spirits were "down."  Dr. Ortenzio noted Carder's difficulty with losing weight; however, he characterized Carder's medical examination itself as "unremarkable" and instructed him to follow-up in five weeks; and

4)    Finally,   on   June   21,   2002,   Carder   reported   sinus congestion. Dr. Ortenzio expressed concern over his blood pressure, which fluctuated with his weight, and recommended another office visit in three months.

On  September  13,  2002,  after  the  Unit  had  receive  Dr. Ortenzio's  records,  Carder  contacted  Prudential  and  spoke  with Michael Dalessio ("Dalessio") regarding his appeal.  According to Dalessio's phone log, Carder indicated that he "does not sleep well and  mornings  are  difficult,  but  once  he  is  up  he  is  fairly functional."   He informed Dalessio that he walks for exercise, plays  with  his  dogs,  spends  time  on  the  computer,  watches television, goes to counseling, dresses, showers and performs light housework.   Further, Carder stated that he "is not totally down just miserable because of the reflux."

Subsequently, on September 27, 2002 the Unit upheld Garcia's decision,  concluding  that  Carder's  physical  conditions  do  not impede his ability to perform sedentary work.  It informed Carder of its decision in a detailed letter which outlined the above-referenced  medical  information,  the  four  sedentary  positions considered appropriate for him and the hourly wages associated with those positions.   The Unit also observed that Carder's difficulty

swallowing and achalasia existed prior to his surgery; however, at that time, he demonstrated an ability to work.

## G.    Carder's Second Appeal

Carder appealed the Unit's decision to the Manager of the Unit. In support of this appeal, the Plan received additional medical records from Dr. Ortenzio.

According to these records, on September 24, 2002, Carder continued to suffer "substantially from esophageal pressure even though esophageal segment was removed in its totality." Dr. Ortenzio further observed that Carder's depression persisted and noted his "resistance to respond to treatment;" however, he did not modify Carder's treatment program and instructed him return in three months.

On November 19, 2002, Carder reported difficulty swallowing, reflux, falling weight, depression and anxiety. He also indicated that he did not "feel strong enough to do much in way of his usual activities."

On December 6, 2002, Dr. Ortenzio further noted Carder's increased post-surgical depression, irritable bowel difficulties, diarrhea and constipation. He also mentioned that Carder only has half-functioning esophageal tissue and recommended a follow-up visit in two months.

Subsequently, on January 24, 2003, Carder's attorney wrote to Prudential regarding his client's case. His letter stated that it is Carder's

> inability to endure strenuous exertion, not the mental problems, which affect his ability to work. This gentleman was a hard working individual who would prefer to return to work if he was physically capable. The fact that he is incapable has created the depression and anxiety, which has resulted in a mental illness diagnosis not the other way around.

Nevertheless, on February 27, 2003, having reached the same conclusions as Garcia and the Unit, the Manager rejected Carder's appeal. Once again, this rejection came in the form of an extremely detailed letter which presented Carder's entire case history and the reasons for the Manager's decision.

## H.    Carder's Third Appeal

Finally, Carder appealed to Prudential's Appeals Committee ("Committee"). He submitted a vocational assessment performed by John W. McCue, a Vocational Rehabilitation Specialist ("Dr. McCue"), who, at Carder's request, had examined Carder at his home.

Dr. McCue found that Carder chiefly complained of diarrhea, chest pain, acid reflux, and nerve damage. His report, based on functional limitations reported by Carder, indicates that Carder is "limited to sedentary, or less, physical demand level," is unable to train due to weakness and sickness, is unable to eat normally

18

and has depression and sleep difficulties related to his medical condition. Dr. McCue further cited "limited or no availability of sedentary jobs in geographic area" as a "Negative Indicator."

Finally, he determined that Carder was unable to return to work as a well tender, unable to locate employment due to the medium to heavy physical demand level normally associated with jobs in his geographic area, and unable to sit or stand for a prolonged period of time in order to train. He, therefore, concluded that "there is no feasible vocational rehabilitation in this claim for job search activities or training."

After receiving Dr. McCue's assessment, the Committee decided that it would contact Carder's physicians. Further, because Dr. McCue had based his assessment on Carder's self-reported, subjective complaints, it decided to order an independent vocational report from Amy Hopkins ("Dr. Hopkins").

Dr. Hopkins reviewed Carder's records and provided the Committee with an in-depth analysis of his case history. In her report, she notes that Dr. Ortenzio is the only physician that claims Carder is unable to perform sedentary work; however, according to her, his opinion relies entirely on Carder's self-reported inabilities. Thus, she concluded that no objective

evidence existed that would preclude Carder from returning to sedentary work.

The Committee also received 2003 medical information from Dr. Achkar, a GI specialist who works with Dr. Rice. On November 13, 2003, Dr. Achkar noted that Carder had a good appetite, a stable weight and no longer experienced vomiting during the day. Further, he found Carder to be cooperative, alert and in no acute distress.

Carder then underwent an EGD, which Dr. Achkar interpreted to reflect "[d]elayed gastric emptying following esophagectomy, otherwise normal exam. Successful dilation of pylorus."

On December 4, 2003, Dr. Achkar ordered X-rays and another EGD, both of which appeared normal. In fact, Dr. Achkar noted that the x-ray showed no stricture of Carder's esophagus and normal gastric emptying time. He further indicated that Carder had reported "marked improvement in regurgitation and 'vomiting.'"

The record further contains a letter written by Dr. Ortenzio to Carder's counsel on October 19, 2003 stating that Carder

> was never able to satisfactually [*sic*] adjust to his surgery and in fact became a gastrointestinal cripple because of multiple GI complaints, muscle weakness, malaise, depression, profound weakness and fatigue. . . .While he has some activity that appears greater than sedentary, he clearly does not retain the ability to be active in the economic marketplace and work at any type of sedentary or less than sedentary level." He

further stated that "[d]ue consideration might be given referral to a psychiatrist for other ideas."

On February 6, 2004, after reviewing the above-referenced materials, the Committee denied Carder's appeal.

## I.   **Carder's Prayer for Relief**

Carder now asks this Court to declare the Committee's denial of his benefits unreasonable and reverse its decision. According to him, the administrative record reflects that he is medically, not mentally, disabled and cannot work due to severe achalasia. The Committee, however, argues that ample evidence exists to support their decision that Carder is physically capable of performing certain jobs and that mental illnesses, i.e., his depression and anxiety, prevent him from doing so.

Carder further contends that the Court should review Prudential's decision to terminate his LTD benefits de novo because the Plan's language does not provide Prudential with the necessary discretion to make final benefits eligibility determinations. Moreover, he argues that a de novo standard of review is appropriate because Prudential had a financial conflict of interest in the outcome of his claim.

**MEMORANDUM OPINION AND ORDER**

**I.  STANDARD OF REVIEW**

**A.  Plan Language**

In reviewing an ERISA plan administrator's decision to deny benefits, a district court must initially decide <u>de novo</u> whether the plan's language grants the administrator discretion to determine the claimant's eligibility for benefits.  29 U.S.C. § 1132(a)(1)(B); <u>see</u> <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989); <u>Quesinberry v. Life Ins. Co.</u>, 987 F.2d 1017, 1021 (4th Cir. 1993).  If the reviewing court determines that the language of the plan confers discretion on the administrator to determine eligibility or to construe terms of the plan, then a court reviews its decision to deny benefits for abuse of discretion.  <u>Bruch</u>, 489 U.S. at 115; <u>Quesinberry</u>, 987 F.2d at 1021.

> There are obviously no magic words required to trigger the application of one or another standard of judicial review.  In this setting, it instead need only appear on the face of the plan documents that the fiduciary has been "given [the] power to construe disputed or doubtful terms" -- or to resolve disputes over benefits eligibility -- in which case "the trustee's interpretation will not be disturbed if reasonable."

<u>De Nobel v. Vitro Corp.</u>, 885 F.2d 1180, 1187 (4th Cir. 1989) (citing <u>Bruch</u>, 489 U.S. at 115).

## MEMORANDUM OPINION AND ORDER

Under the terms of Carder's LTD Plan, an employee's coverage begins when, <u>inter alia</u>, he has "met any evidence requirement for Employee Insurance." In circumstances in which evidence is required to determine enrollment eligibility, "*Prudential decides* [if] the evidence is satisfactory."

Further, when an employee applies for long term disability benefits,

> "Total disability" exists *when Prudential determines* that all of these conditions are met:
> (1) Due to Sickness of accidental injury, both of these are true:
> > (a) You are not able to perform, for wage or profit, the material and substantial duties of your occupation.
> > (b) After the Initial Duration of a period of Total Disability, you are not able to perform for wage of profit the material and substantial duties of any job for which you are reasonably fitted by your education, training or experience . . .
> (2) You are not working at any job for wage or profit.
> (3) You are under the regular care of a Doctor.

Prudential also "determines" whether the conditions of "partial disability" are met.

In section D, "Benefits for Expenses of Rehabilitation," the Plan goes on to provide that:

> *Prudential may determine*, after consulting your Doctor, that:

> (1)  you are able to be in a program of rehabilitation that may help you to be able to support yourself; and
> (2)  you should cease to be Disabled and be able to support yourself after being in such program.
> *Prudential will determine* the type of expenses that will be covered and when they may be incurred. Prudential will inform you of the terms under which payment will be made.

The same is true of Section E, "Benefit Limitation," which limits LTD coverage to twenty-four months "if your Disability, *as determined by Prudential*, is caused at least in part by a mental, psychoneurotic or personality disorder."

Further, the "Claim Rules" provide that "Prudential must be given written notice that a claim will be made . . ." and "Prudential must be given written proof of the loss for which claim is made under the Coverage." Benefits are not paid until Prudential receives such written proof.

Carder argues that the above-cited LTD Plan language is insufficient to confer discretionary authority on Prudential because "the language says that Prudential <u>can</u> determine initial eligibility" and not that "it <u>has</u> the discretion to be the final authority on eligibility." As the Fourth Circuit stated in <u>De Nobel</u>, however, this Court "perceive[s] no principled basis . . . on which [it] could engage in semantic hairsplitting of that sort." 885 F.2d at 1187.

## MEMORANDUM OPINION AND ORDER

In <u>De Nobel</u>, the court found no merit in the plaintiffs' argument that a Plan's language did not confer "discretion" on the trustee of the Plan for the simple reason that the word "discretion" itself did not appear in the Plan documents. Similarly, there is no merit in Carder's argument that Prudential has no discretion or final authority simply because the words "final authority" are absent from the LTD Plan.

This Court finds that the language in Prudential's plan is more than adequate to confer final discretion to make benefits eligibility determinations on Prudential. <u>Accord</u> <u>Machovec v. Prudential Life Ins. Co. of America</u>, 2004 U.S. District LEXIS 12496, *12-13 (D. Md. June 28, 2004). <u>See</u> <u>Thompson v. Life Ins. Co. of N. Am.</u>, 30 Fed. Appx. 160, 164 (4th Cir. 2002) (unpublished) (holding that language requiring "due proof" of eligibility is sufficient); <u>see also</u> <u>Perez v. Aetna Life Ins. Co.</u>, 150 F.3d 550, 556 (6th Cir. 1998) (en banc) (finding that language requiring "satisfactory evidence" conferred discretion); <u>Donato v. Metropolitan Life Ins. Co.</u>, 19 F.3d 375, 379 (7th Cir. 1994) (finding same based on provision that "all proof must be satisfactory to us").

Accordingly, the Court will examine Prudential's decision using an "abuse of discretion" standard.

## B.   Conflict of Interest

Under the deferential "abuse of discretion" standard, a district court cannot disturb an administrator's decision "if it is reasonable, even if [the court] would have come to a different conclusion independently."   Evans v. Metro. Life Ins. Co., 358 F.3d 307, 310-11 (4th Cir. 2003)(citing Booth v. Wal-Mart Stores, Inc., 201 F.3d 335, 341 (4th Cir. 2000)).  A decision is reasonable if "it is the result of a deliberate and principled reasoning process and is supported by substantial evidence."  Id. (citing Brogan v. Holland, 105 F.3d 158, 161 (4th Cir. 1997).

However, when the Plan administrator is also the insurer of the Plan, "a conflict of interest exists, and that conflict must be weighed as a factor in determining whether an abuse of discretion occurred."  Id.; see Ellis v. Metropolitan Life Ins. Co., 126 F.3d 228, 233 (4th Cir. 1997).   Accordingly, deference to the plan administrator is lessened, but only "to the degree necessary to neutralize any untoward influence resulting from the conflict." Doe v. Group Hospitalization and Med. Serv., 3 F.3d 80, 87 (4th Cir. 1993).

In this case, it is undisputed that Prudential is both the administrator and the insurer of the Plan.  Carder, however, argues

that Prudential has a financial conflict of interest that is significant enough to warrant a <u>de novo</u> review.

In support of this argument, Carder submitted the deposition of Sharon E. Martins ("Martins"), an underwriter at Prudential. Martins testified that Prudential had a group insurance contract with Dominion from 1997 until 2002. During that time, Prudential would receive monthly premiums from Dominion based on the gross monthly salaries of its participating LTD employees. In 2002, however, Dominion terminated its contract with Prudential. Thus, Prudential continued to have an obligation to pay LTD benefits to Carder, but Dominion no longer had an obligation to pay premiums to Prudential.

Although this Court agrees that the termination of Prudential's contract with Dominion is a factor that must be considered in its analysis of this case, "[u]nder no circumstances may the court deviate entirely from the abuse of discretion standard." <u>Mitchell v. Fortis Benefits Ins. Co.</u>, No. 04-2307, 2005 U.S. App. LEXIS 15693, * 13 (4th Cir. July 29, 2005) (unpublished) (<u>citing</u> <u>Ellis v. Metro Life Ins. Co.</u>, 126 F.3d 228, 233 (4th Cir. 1997)). Instead, the "more incentive for the administrator or fiduciary to benefit itself by a certain interpretation of benefit eligibility or other plan terms, the more objectively reasonable

the administrator or fiduciary's decision must be and the more substantial the evidence must be to support it." <u>Ellis</u>, 126 F.3d at 233.

In this case, there is more than substantial evidence to support Prudential's decision.

### III.   REVIEW OF COMMITTEE'S DENIAL OF BENEFITS

At bottom, Carder's dispute lies with the propriety of the Committee's decision to classify his illnesses as "mental" and to ignore the fact that they resulted from his physical condition. Moreover, he asserts that the Plan never before applied the provisions of the policy relating to disabilities based on "mental illness" in his case.  Nevertheless, a careful review of the record reviewed by Prudential establishes that there is substantial evidence to support a finding that Carder is capable of returning to work in a sedentary position and that, if he is unable to do so, it is a result of mental illness.

### A.   Carder's Mental Illnesses

Although Carder does not deny the existence of his depression, stress, anxiety and sleep disorders, he argues that, because these disorders developed as a result of his esophageal and related conditions, they should not be classified as mental illnesses. According to the <u>American Psychiatric Association Diagnostic and</u>

**MEMORANDUM OPINION AND ORDER**

<u>Statistical Manual</u> ("DSMIV"), however, anxiety, depression and sleep disorders are "mental illnesses." Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (4th ed., text revision, 2000). Although these disorders may have <u>resulted</u> from Carder's physical conditions and have impacted his ability to work, the Plan specifically states that "if your Disability, as determined by Prudential, is caused *at least in part* by a mental, psychoneurotic or personality disorder," benefits are not payable for greater than twenty-four months.

His diagnosis of depression and the references in the record to his anxiety and sleep problems, therefore, provide substantial evidence that Carder does suffer from mental illnesses. Accordingly, because, under the terms of the Plan, Carder's eligibility for LTD benefits based on "mental illness" expired in 2002, he can only continue to receive LTD benefits if his physical diseases meet the Plan's definition of "total disability." There is, however, substantial evidence that his mental illnesses, and not his physical illnesses, are responsible for his inability to return to work.

**B.    Carder's Ability to Perform Sedentary Work**

    **1.    Prudential's Obligations Under the LTD Plan**

    Carder argues that, given his history of esophageal problems, including that he must have his esophagus "stretched" as necessary, the Committee acted unreasonably in determining that he is no longer medically disabled based on the stability of his condition over a one year period.

    The LTD Plan, however, contains no provisions that require it to allow an employee to remain on disability if his condition can only be stabilized through the use of surgical procedures or medication, or if his condition has only been stable for a short period of time.   In point of fact, in a case such as Carder's, the Plan's only obligation is to determine whether, at the time of review, the employee is able to perform *any* occupation which he could reasonably be expected to perform satisfactorily in light of his age, education, training or experience.  This is precisely what Prudential did when it reviewed the record to determine whether Carder remained eligible for LTD benefits.   Thus, there is substantial evidence that Prudential acted reasonably in reaching its determination that Carder did not.

### 2. Evidence that Carder is Physically Capable of Returning to Work

According to Carder, Prudential approved his application for benefits solely because of his achalasia. However, Carder applied for LTD benefits in order to recover from his March 2000 surgery. Indeed, on Carder's LTD application, Dr. Rice listed his prognosis as "post-op recovery;" triage, therefore, immediately recommended a vocational assessment; and Carder himself agreed that he would assess his ability to return to work upon recovery from surgery.

Moreover, Carder had been suffering from dysphagia, achalasia and the cluster of symptoms that characterize these diseases since 1990. Until 2000, however, he had had no trouble working. Although Prudential concedes that his post-surgical condition renders him incapable of performing a physical occupation, it contends there are a variety of appropriate sedentary occupations available with comparable salaries.

Carder's chief complaint appears to be that he is unable to return to the "physical" work he performed prior to his surgery. The Plan, however, is only obligated to continue his benefits if he cannot perform *any* job, not any *desired* job. Admittedly, Carder engages in daily activities, such as grocery shopping, working on his computer, playing with his pets and fishing, and these

activities are consistent with an ability to perform sedentary work.

Further, Carder's medical records reflect a stable physical condition. Indeed, since 2001, Dr. Rice and Dr. Achkar have indicated that his condition is unremarkable and only require him to visit annually. Dr. Ortenzio's records also reflect unremarkable physical check-ups and persistent depression.

Although Dr. Ortenzio and Noffsinger later wrote to the Plan in support of Carder's appeal, Dr. Ortenzio conceded that Carder's esophageal condition is stable. He contends that, in Carder's case, "stable" indicates "less than sedentary" abilities; however, he has no objective basis for this conclusion. Indeed, Dr. Ortenzio's medical notes indicate that *Carder* had reported the majority of his esopohageal symptoms. Dr. Ortenzio is not a GI specialist. Moreover, despite observing Carder's "resistance to treatment," he did not perform any tests or x-rays on Carder and never attempted to modify his treatment plan.

The only aspect of Carder's condition that Dr. Ortenzio did objectively observe is that Carder suffers from mental and nervous conditions. Dr. Ortenzio considered this condition to be persistent and recommended that he be referred to a psychologist. He even made this recommendation in a letter to Carder's counsel on

32

October 19, 2003.   Similarly, Noffsinger stated that Carder is "severely depressed . . . due to the stress related to his worries regarding his physical limitations" and is not "physically able to function in a job with the type of fatigue which he has been experiencing."   His ability to receive benefits based on these mood disorders, however, expired in 2002.

Notwithstanding   the   overwhelming   evidence   supporting Prudential's finding, Carder argues that it acted unreasonably in failing to request any independent medical evaluations ("IME"), with the exception of Dr. Hopkins' vocational assessment.   He also faults Prudential for relying on Dr. Hopkins' assessment instead of that of Dr. McCue.   These arguments are without merit.

Carder's own physicians provided more than substantial support for Prudential's findings.   The only unresolved question concerned whether   Carder   could   find   an   appropriate   profession   in   his geographic area.   Carder provided Dr. McCue's vocational report; however, Dr. McCue had only visited with Carder once and based his analysis solely on self-reported information.   Further, while his report focuses on the "*limited*" availability of sedentary jobs in the Clarksburg, West Virginia area, he never indicated how he had determined the availability of such jobs. Moreover, significantly, Dr.   McCue's   report   did   not   preclude   a   finding   that   Carder   is

33

capable of working. To the contrary, he found that Carder is capable of "*sedentary*, or less, *physical* demand level."

Thus, Prudential acted reasonably in seeking another vocational opinion from Dr. Hopkins, whose report is much more comprehensive than that of Dr. McCue, and provides an objective, reasoned analysis of Carder's medical situation.

Ultimately, therefore, the Committee, being faced with substantial evidence that Carder's inability to work is grounded in his mental illnesses, acted reasonably when it affirmed the discontinuation of his benefits.

### IV. CONCLUSION

Finding that there is no material question of fact as to whether there is substantial evidence to support the Committee's denial of Carder's benefits, the Court **GRANTS** the defendant's motion for summary judgment (dckt no. 30), **DENIES** the plaintiff's motion for summary judgment (dckt no. 31) and **DISMISSES** the plaintiff's case **WITH PREJUDICE.**

It is so **ORDERED.**

## MEMORANDUM OPINION AND ORDER

The Clerk is directed to transmit copies of this Order to counsel of record and pro se plaintiff.

DATED: August _____26_____, 2005.


IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE